# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:10-CR-360-VEH-JEO** |
| | ) |
| **JEREMY BROWN,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OF OPINION AND ORDER

### I.    Introduction

This matter is before the court on various Motions To Dismiss (*see* docs. 17, 25, 27, & 28) (the "Motions") filed by Defendant, Jeremy Brown ("Brown"; "Defendant"). Brown seeks to dismiss his indictment for assaulting a correctional officer on the grounds that the indictment is the result of selective and/or vindictive prosecution.

On January 26, 2012, the parties filed a Stipulation of [Agreed] Facts (doc. 43) and Magistrate Judge John E. Ott held an evidentiary hearing on the Motions.  On March 6, 2012, Judge Ott entered a Report and Recommendation ("R&R") (doc. 46) recommending that the Motions be denied.  On March 20, 2012, Brown was granted an extension of time to file objections to the R&R.  Brown filed his Objections on April 6, 2012.  (Doc. 48).  The Government filed no objections to the R&R, nor has the

Government responded to the Defendant's Objections, and the Government's time to do so has expired. (*See* margin order entered 2/16/2012, setting deadlines.) Defendant's Objections are now before the Court.

The court has reviewed the pleadings, the transcript of the hearing and all exhibits to such transcript, the parties' Stipulation, the R&R, and the Objections, and sets out its findings of fact and conclusions of law below. Based on those findings of fact and conclusions of law, the Motions are due to be, and hereby are, **DENIED**.

## II.   <u>Standard of Review</u>

Under the Federal Magistrates Act, Congress vested Article III judges with the power to authorize a magistrate judge to conduct evidentiary hearings. The relevant portion of the Act is found at 28 U.S.C. § 636. A district court judge may designate a magistrate judge to conduct hearings, including evidentiary hearings, in order to submit proposed findings of fact and recommendations for the disposition of motions. This district has generally referred certain criminal proceedings, including motions to suppress, to its magistrate judges.

Within fourteen days after being served with a copy of the report and recommendation, any party may file written objections to the proposed findings and recommendations. *See* 28 U.S.C. § 636. After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or

modify the magistrate judge's report and recommendation. *See* 28 U.S.C. § 636(b)(1); *Williams v. Wainwright*, 681 F.2d 732 (11th Cir. 1982). A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted). A district judge must review legal conclusions *de novo*, even in the absence of an objection. *See Cooper-Houston v. Southern Ry.*, 37 F.3d 603, 604 (11th Cir. 1994); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1431-32 (S.D. Fla. 1993), *aff'd* 28 F.3d 116 (11th Cir. 1994). That said, the court also acknowledges the principle that "[n]either the Constitution nor the statute requires a district judge to review, *de novo*, findings and recommendations that the parties themselves accept as correct." *United States v. Woodard*, 387 F.3d 1329, 1334 (11th Cir. 2004) (citation omitted). Moreover, absent specific objections, there is no requirement that a district judge review factual findings *de novo*. *See Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993) (noting that when a party "did not file specific objections to factual findings by the magistrate judge, there was no requirement that the district court *de novo* review those findings") (emphasis in original) (citations omitted).

## III. Analysis

### A. Factual and Procedural Background before Magistrate Judge[1]

Brown is charged with assaulting a correctional officer "by striking him with a substance purported to contain feces and urine" in the face on March 25, 2010. (Doc. 1). The incident allegedly occurred while the Defendant was housed in the Special Management Unit ("SMU") at the Federal Correctional Institution in Talladega, Alabama. He was indicted in this action on September 30, 2010. (*Id.*)

The Defendant initially filed a motion to dismiss the indictment premised on allegations of selective prosecution. Specifically, he alleges that he has been selected for prosecution while similarly situated inmates have not been. He further asserts that he is being prosecuted because of his prolific legal writings and court filings. (Doc. 17 at 3 of 6). Therein, he also requested written discovery from the prosecution. (*Id.* at 5 of 6). The United States filed a "Response," including various records and an affidavit of FBI Special Agent Preston Leingang. (Doc. 20). The court ordered the United States to disclose any incident reports concerning assaults against correctional officers involving bodily fluids in or about the area of the face. (Doc. 22 at 5). The United States produced 41 incident reports in compliance with the court's order. (See Doc. 25

---

[1] This section III.A. of the court's Memorandum Opinion and Order is lifted *verbatim* from the R&R. (*See* doc. 46, I. BACKGROUND, pp. 1-3).

at 1).

Brown next filed an amended motion to dismiss in support of his claim of selective prosecution and, among other things, alleged a new claim of vindictive prosecution. (Doc. 25 at 3 & n.5). Therein, he also requested additional discovery on his claims. (*Id*. at 4-5 of 6). Further, he requested an evidentiary hearing. (*Id*.) The United States filed a "Response" to the amended motion, asserting that Brown's claims are without merit. (Doc. 26). Subsequently, Brown filed a motion in support of his claims, alleging that all the necessary discovery had not been disclosed by the United States. (Doc. 27). Next, he filed a "Second Motion in Support of Amended Motion to Dismiss as Relief Against Selective and Vindictive Prosecution." (Doc. 28). The United States filed a response to the Defendant's "Second Motion" and his request for discovery. (Doc. 29). The court ordered the parties to submit additional evidence in support of and in opposition to the request for discovery. (Doc. 30 at 7). The United States filed a "Reply" to Brown's claim of vindictive prosecution. (Doc. 35). After the evidence and all arguments were submitted, the court ordered the United States to produce the following:

1.   Any BOP records from March 2009 through September 2010[] reflecting assaults on BOP officers and personnel in the SMU involving a weapon (e.g., a knife, shank, a broom or stick, a razor) **and** serious injury;

2.   Any BOP records showing the referral of incidents described in

> "1" above to the FBI or United States Attorney for prosecution; and,
>
> 3.  Any BOP records showing the results of any referrals described in "2" above (e.g., declination letters, judgments or convictions).

(Doc. 36 at 12 of 13 (bold in original and footnote omitted)).

Brown's motions to dismiss the indictment were set for an evidentiary hearing. (Doc. 36 at 13 of 13 & Docket Entry dated January 20, 2012). The evidentiary hearing was conducted on the motions to dismiss on January 26, 2012, at FCI Talladega. The parties submitted the matter on the evidence from the hearing and the prior submissions and arguments.[2]

## B.  R&R Findings of Fact

The only "fact" found by Judge Ott to which any party has objected is Judge Ott's finding "that the disparate treatment was not improperly motivated." (Objections, Doc. 48. p. 1).[3]  Neither party has objected to the legal standards set out in the R&R.

---

[2] The parties also submitted a "Stipulation of Facts" which provided that the incident reports admitted at the hearing (other than those that referenced Jeremy Brown) "are authentic and accurate." (Doc. 43).

At the hearing, defense counsel objected to Government Exhibit 6 (PSR for Jeremy Pinson). Because counsel had not seen the lengthy exhibit before the proceeding, the court allowed him to file written objections following the hearing. (Doc. 44).  The United States was allowed to file a response. (Doc. 45). Upon consideration, the court finds that the objections are due to be granted in part and denied in part. To the extent the information was adduced during the cross-examination by the prosecution, it is admitted as impeachment testimony. In all other respects, it is excluded.

[3] Judge Ott found that "Warden Rathman's assessment — that the failure to prosecute the other inmates was a matter of human error — is the most likely explanation for the distinction."

Rather, the Defendant has objected to Judge Ott's finding that the disparate treatment was not improperly motivated and his resulting conclusion that the indictment was not due to be dismissed. The court will therefore adopt the facts as set out in the R&R. For the reader's convenience, those facts are set out below.

### 1.    Background

The evidence demonstrates that Brown was moved to the SMU at FCI Talladega in about March 2009. (Def. Ex. 7).[4] During his transportation from USP McCreary, Pine Knot, Kentuc[k]y to Talladega, Alabama, he was assaulted by David Sneed,[5] a corrections officer at USP McCreary. Sneed recently pled guilty in the United States District Court for the Eastern District of Tennessee to striking Brown while he "was secured in restraints, including handcuffs, leg irons, and a Martin or 'belly' chain." (Def. Ex. 5 at 2-3). Brown filed a civil suit pursuant to *Bivens*,[6] concerning the assault on November 9, 2009. (Def. Ex. 7). Many of the staff at the SMU in Talladega were aware of Brown's suit and the allegations.

_____

(Doc. 46 at 14). For the reasons set out *infra*, the undersigned finds that "Warden Rathman's assessment" was not a fact, but was an opinion and that such opinion was not even based on personal knowledge.

[4] Unless noted elsewhere, references to Ex. ___ are to the exhibits from the evidentiary hearing.

[5] Brown incorrectly identifies Sneed as Snead in his earlier pleadings.

[6] *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971).

The evidence also shows that inmate assaults on correctional officers in the SMU is a serious issue, and has been for a while. The present indictment alleges that Brown participated in such an incident on March 25, 2010. (Doc. 1).

FBI Special Agent Preston Leingang was contacted by prison officials on March 26, 2010, to conduct a criminal investigation into the matter. (Def. Ex. 9). On March 30, 2010, Brown was interviewed by Agent Leingang. According to Brown, in that interview he was told by Leingang that unless he stopped filing prison grievances, he would face more prison time.[7] (Doc. 17 at 3; Doc. 17-3).[8] On May 11, 2010, and July 15, 2010, Leingang was provided with copies of the BOP investigative file and CD-ROMs containing relevant evidence, respectively, in this matter. (Def. Ex. 10 & 11).

### 2. Jeremy Pinson

Brown offered evidence from Jeremy Pinson, a former SMU inmate, prior to the evidentiary hearing wherein he stated, in part, that inmate assaults on prison staff were routine in the SMU. Pinson further stated that BOP Lieutenant James Preston told him that Brown "was 'going to be made an example of'" and "that it was 'unfair' that a

---

[7] It is undisputed that Brown filed numerous grievances while he was incarcerated at FCI Talladega. Specifically, the record shows that he filed 188 complaints from March 23, 2009, until October 12, 2010. This averages to approximately one grievance every three days. (*See* Doc. 17 at 3).

[8] This allegation is made in the motion and supported by a grievance form the defendant filed with the BOP. He did not testify at the hearing. Additionally, Special Agent Leingang denied Brown's allegations during his testimony at the hearing.

guard was being prosecuted by the Government for assaulting Brown when Brown had not been prosecuted for assaulting staff." (Def. Ex. 24 at 2).[9] Additionally, he stated that FCI Talladega Assistant Warden Becky Clay, made comments regarding Brown's "filing of lawsuits and grievances" and his (Brown's) cooperation with the Office of the Inspector General concerning the prosecution of the guard that assaulted him. (*Id.* at 3). Pinson also stated that Clay "indicated that Brown was going to 'get a taste of his own medicine.'" (*Id.*) Lastly, Pinson stated that Clay told him that she was going to "make sure that Brown was prosecuted" using her close relationship with the FBI. (*Id.*) The United States filed a response challenging the credibility of Pinson and refuting the statements attributed to Preston and Clay. After considering the response and the affidavits,[10] the court found that the matter required a credibility determination. This led to the testimony of all three witnesses – Pinson, Preston, and Clay – at the evidentiary hearing.

Pinson reiterated his previous statements during his testimony at the evidentiary

_____

[9] Pinson's affidavit is also located at document 33 in the file. (Doc. 33 at 3-5).

[10] Clay's denial of Pinson's claim that she would use her close personal relationship with the FBI to ensure he was prosecuted was [substantiated] by the affidavits of FBI Special Agents Leingang and Frank Langdon, Jr. Leingang was the point-of-contact for investigations involving criminal activity at FCI Talladega from 2004 to 2010. Langdon has been the point-of-contact since December 2010. Leingang and Langdon both state that they have received referrals of incidents at the FCI for investigative consideration, but neither Clay nor Preston has "ever contacted [them], either directly or indirectly, to urge the initiation of a federal prosecution of a particular inmate, including Jeremy Brown." (Doc. 35 at Ex. L & M).

hearing.[11]  Preston and Clay also reiterated their previous denials. Brown also offered a June 25, 2010 incident report involving Pinson being written up for assaulting a corrections officer with a sharpened instrument, "causing a small puncture wound and bruising" to demonstrate the unconstitutional selection of Brown for prosecution. (Def. Ex. 2 at 2). The Pinson matter was referred for criminal prosecution, but was declined. (Doc. 27 at 17). Instead, he was transferred to "ADX-GP Florence, Colorado" upon the request of FCI Talladega Warden John T. Rathman. (Def. Ex. 3 at 2; Doc. 27 at 17).

### 3.    Other Inmates

In support of his claims, Brown notes that other inmates engaged in similar conduct, but were not prosecuted. By way of example, he cites to inmates Stephen Burke, Antoine Bruce, Demetrius Hill, Chavon Wiggins, Richard Blount, Laron Marshal, and Demarcus Law. (Doc. 33 at 3).

### a.    Stephen Burke

Stephen Burke was involved in four incidents where fecal matter was thrown on 6 correctional officers. Only one incident involved the material striking an officer in the face.  (Def. Ex. 20 (June 18, 2009 at 12:15 p.m. ("feces striking me in the front of my

---

[11] Upon agreement of Brown and counsel, Pinson testified live via videoconferencing from the Administrative Maximum United States Penitentiary in Florence, Colorado.

body including my face" involving Officer Foreman)), Def. Ex. 21 (June 18, 2009 at 1:30 p.m. ("striking me on the right side of the body" involving Lieutenant Brown)), Def. Ex. 22 (October 11, 2009 (Burke threw "a liquid that appeared to be human feces out of a bottle, which landed on Officer Parker and Officer Spencer")), and Def. Ex. 23 (October 22, 2009 ("threw fecal material")). He was not criminally prosecuted for any of the assaults.[12]

### b.    Antoine Bruce

Antoine Bruce was involved in seven incidents involving fecal matter. However, only one involved a strike to the face. (Def. Ex. 13 (September 6, 2009 ("back, legs and arms")), Def. Ex. 14 (November 15, 2009 ("all over my left side (from chest to feet)")), Def. Ex. 15 (April 18, 2010[13] ("upper right torso and my right leg")12), Def. Ex. 16 (April 19, 2010 ("hit me in my face, eyes, mouth and chest and arms")), Def. Ex. 17 (June 22, 2010 ("threw a cup of warm urine on me as I approached his cell")), Def. Ex. 18 (July 24, 2010 (threw urine and stated "thats [sic] for you writing that shot the other day...")), and Def. Ex. 19 (July 24, 2010 ("threw a green and warm yellow liquid that smelled like urine and feces on me...")). He has not been prosecuted for any

---

[12] The record demonstrates that the FBI was notified of the October 22, 2009 incident. (Def. Ex. 23). No party has offered an explanation why the FBI was contacted regarding this incident and not the others.

[13] The incident date is March 27, 2010, but the report reflects a "Date of Incident" of April 18, 2010). (Def. Ex. 15 at No. 4).

of these assaults. Lieutenant Preston testified that criminal prosecution was declined as to Bruce. Agent Leingang testified that none of these matters, including the strike to the face (April 19, 2010), were referred to the FBI. Accordingly, he did not forward them to the United States Attorney for the Northern District of Alabama for approval for presentation to a grand jury.

### c. Demetrius Hill

Demetrius Hill was involved in a total of five incidents. One occurred two days after the incident involving Brown. (Doc. 20 at 6 n.3). The others occurred later. The record does not demonstrate that any of these incidents involved strikes in or around the face. Hill has not been prosecuted for any of these and there is no indication that any prosecution is being contemplated.

### d. Chavon Wiggins

According to the affidavit of Pinson, "sometime in 2009," while Chavon Wiggins was housed in the SMU, he slipped out of his handcuffs and used his hands and a broom handle to assault a staff member, but was never criminally charged. (Doc. 33 at 3). The United States responded that a search of the prison's database from January 1, 2009, to present fails to substantiate these claims. According to the United States, Wiggins was involved in two incidents during the alleged period. One occurred on

August 25, 2010, when Wiggins refused restraints.[14] The other took place on May 24, 2010, when Wiggins attempted to slip out of his restraints and threw a shoulder into a SMU correctional officer, but was immediately taken to the ground and subdued. According to the report resulting from this incident, which was submitted as an exhibit before the evidentiary hearing (doc. 35 at Ex. A), there were no injuries to either Wiggins or staff members. (*Id.*) Additionally, there is no mention of the use or attempted use of a broom or mop handle by Wiggins. (*Id.*) At the hearing on the motions, Pinson stated that he did not see the incident, but was aware of the same premised on his review of certain records and other conversations.

### e. Richard Blount

Again, according to Pinson, SMU inmate Richard Blount manufactured a "spear" from items in his cell in or about January 2011. (Doc. 33 at 3). Blount then summoned a staff member and stabbed him in the hip. (*Id.*) The United States responded that "[w]hile Pinson's report of the incident is correct, his report of the outcome is altogether wrong." (Doc. 35 at 5). On September 30, 2011, Blount was indicted by a federal grand jury, charged with one count of assaulting a corrections officer with a "make-shift" spear, in violation of 18 U.S.C. § 111(a)(1)(b). (*Id.* & Ex. B). Blount pled

---

[14] The United States notes that there is no available report detailing this incident. (Doc. 35 at 4 n.6). The reason for the lack of a report is not specified.

guilty to the charge on November 16, 2011, and is scheduled to be sentenced on March 16, 2012. (*Id*. at Ex. C). The defendant offered nothing to refute this information at the evidentiary hearing.

### f.    Laron Marshall

Pinson next states in his affidavit that SMU inmate Laron Marshall grabbed a staff member's arm, pulled it through the food slot, and cut the officer's arm with a blade from a disposable razor. (Doc. 33 at 3). Pinson further stated in his affidavit that he observed the incident and read the incident report. (*Id*.) Marshall was not prosecuted. The United States has responded that Marshall was not prosecuted because the facts are not as Pinson states. As noted previously by this court, although Marshall had three incidents involving assaults during the relevant period, none were of the gravity suggested by Pinson. (Doc. 35 at 6). One concerned the infliction of a small laceration on the hand of a corrections officer below the "pinky" finger when Marshall grabbed an officer's hand and keys as the officer attempted to resolve a conflict over a food tray. A second involved "a minor laceration to [an officer's] left index finger," from striking Marshall's cell food slot. The third involved "a minor injury to the top of [an officer's] left hand," which resulted from an altercation with no evidence of a weapon being involved. (*Id*. & Ex. D, E ,& F). Pinson testified at the hearing that he did not see the razor blade.

### g. Demarcus Law

According to a May 14, 2010 incident report, Demarcus Law threw a "cup full of feces and urine" on the back right shoulder, neck and face of a correctional officer. (Def. Ex. 12). When the officer attempted to secure the inmate's door slot, Law threw another cup of feces and urine. The report does not specify where it landed. (*Id.*) Agent Leingang testified that he did not receive a referral regarding this matter. There was no prosecution regarding this incident. There was no further specific evidence presented concerning the reason for the lack of a prosecution or whether any other administrative action was taken.

### 4. Other Evidence

Warden Rathman testified that soon after he arrived at FCI Talladega in February 2010, he realized that assaultive behavior at the SMU was a problem.[15] He also testified that there was some apparent disparity in the treatment of certain inmate actions at the institution. The incident involving Brown was, in his mind, particularly egregious. Rathman attributed the variances in the handling of the cases to "human error." He indicated that he was taking corrective actions to deal with the situation.

### B. Applicable Law

Brown has alleged both selective prosecution and vindictive prosecution.

---

[15] Rathman also noted that 95% of the grievances at the prison originate in the SMU.

Vindictive prosecution is distinguishable from selective prosecution in that vindictive prosecution arises when the severity of the charges against a defendant is increased after the defendant exercises a constitutional right after criminal charges have begun, while selective prosecution occurs when a person is prosecuted based on an immutable personal characteristic, such as race or religion, or in response to some constitutionally-protected act that a person has done prior to the criminal charge being brought against him. The court will set out the standard for each theory in turn.

### 1.    Selective Prosecution

Claims of selective prosecution have been recognized by the Supreme Court for well over a century. In *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), two Chinese subjects raised challenges under the Fourteenth Amendment's Equal Protection Clause to their incarceration for violating a San Francisco ordinance requiring operators of laundries in wooden buildings to obtain a permit from the city. About 200 Chinese owners of wooden laundries had been denied permits, whereas 80 non-Chinese owners had been granted permits to carry on their businesses under similar conditions. *Id*. at 374, 6 S.Ct. 1064. The Supreme Court reversed the convictions, declaring:

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is ... within the prohibition of the Constitution.

*Id*. at 373-74, 6 S.Ct. 1064. In other words, a decision to prosecute that is "deliberately based upon an unjustifiable standard such as race,

> religion, or other arbitrary classification" is a denial of equal protection. *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). The ban on discriminatory prosecution is not limited to the states but also applies to the federal government under the Fifth Amendment's Due Process Clause. *Wayte v. United States*, 470 U.S. 598, 608 n. 9, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

*U.S. v. Deberry*, 430 F.3d 1294, 1298 - 99 (10th Cir. 2005), *cert. denied*, 137 S.Ct. 113 (2006).

As noted by the Magistrate Judge, in *Wayte*, the Supreme Court set out the constitutional constraints on prosecutorial discretion as follows:

> [A]lthough prosecutorial discretion is broad, it is not " 'unfettered.' Selectivity in the enforcement of criminal laws is ... subject to constitutional constraints." In particular, the decision to prosecute may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' " including the exercise of protected statutory and constitutional rights.

*Wayte v. U.S.*, 470 U.S. 598, 608 (alterations in original) (internal citations omitted).

*Wayte* instructs that selective prosecution cases are to be "judge[d] ... according to ordinary equal protection standards." (*Id.*). Unless the equal protection claim is based on an overtly discriminatory classification, "these standards require petitioner to show <u>both</u> that the passive enforcement system had a discriminatory effect <u>and</u> that it was motivated by a discriminatory purpose." (*Id.*) (emphasis supplied).

To show discriminatory effect, a defendant must show that

"similarly situated individuals were not prosecuted." [*United States v.*]

*Smith*, 231 F.3d [800] at 809 [(11th Cir. 2000)]. As we've explained:

> [A] "similarly situated" person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*Id*. at 810. We have considered a comparison of the criminal histories of defendants to be relevant to the "similarly situated" inquiry. *See* [*United States v.*] *Quinn*, 123 F.3d [1415] at 1426 [(11th Cir. 1997)]. Accordingly, "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." *United States v. Bass*, 536 U.S. 862, 864, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) (mem.) (per curiam) (emphasis omitted). The discriminatory purpose prong requires that "the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quotations and alteration omitted).

*United States v. Jordan*, 635 F.3d 1181, 1188 -89 (11th Cir. 2011).

The Magistrate Judge expressly found that "Brown has satisfied part of his [selective prosecution] claim. He has shown that similarly situated individuals have not been prosecuted for like conduct." (R&R, Doc. 46, p.11).

Neither Brown nor the Government has objected to this finding. The undersigned therefore accepts it as well, and all the facts set out in the R&R setting out

the basis for this finding.[16]

However, the Magistrate Judge found that

> Brown ... has not satisfied the second element of the selective prosecution claim. He has not shown with credible evidence that his prosecution was improperly motivated. To the extent he has offered his written grievance (doc. 17-3) that Leingang made it very clear that prison officials were going to "get me more prison time" if Brown did not "stop filing on prison officials," the court is not impressed for a number of reasons. First, Brown did not testify at the hearing regarding this statement so he could not be cross-examined. All the court is left with is his written grievance. Second, Leingang and Lieutenant Greg Smith testified at the hearing and denied that the statement was made to Brown. Third, the court finds the testimony of Leingang and Smith to be credible. Nothing in the record but Brown's written grievance challenges their testimony and that [written grievance] is insufficient.

> To the extent Brown has offered the testimony of Pinson that Preston commented that Brown "was 'going to be made an example of'" and "that it was 'unfair' that a guard was being prosecuted by the Government for assaulting Brown when Brown had not been prosecuted for assaulting staff" (doc. 33 at 4 of 5) and that Warden Clay commented on Brown's "filing of lawsuits and grievances" and would use her influence to see that he was prosecuted, the court does not find Pinson credible.

(Doc. 46 at 12).

---

[16] A district judge must review legal conclusions *de novo*, even in the absence of an objection. *See Cooper-Houston v. Southern Ry.*, 37 F.3d 603, 604 (11th Cir. 1994); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1431-32 (S.D. Fla. 1993), *aff'd* 28 F.3d 116 (11th Cir. 1994). That said, the court also acknowledges the principle that "[n]either the Constitution nor the statute requires a district judge to review, *de novo*, findings and recommendations that the parties themselves accept as correct." *United States v. Woodard*, 387 F.3d 1329, 1334 (11th Cir. 2004) (citation omitted).

The undersigned accepts the Magistrate Judge's credibility determinations. First, they are not challenged by Brown. Second, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110 (1974). Therefore, the Magistrate Judge was entitled to find the testimony of the agents, who were subjected to cross-examination, more credible than a written statement given by Brown, who did not testify. Finally, the Magistrate Judge's finding that Pinson was not credible is well-substantiated in the record. (*See* Doc. 46 at 12-14). Additionally, the Magistrate Judge had the opportunity to hear and observe both Pinson and the agents whose testimony directly refuted Pinson's testimony.[17] Thus, there is no credible direct — as opposed to circumstantial — evidence of an improper government motive in prosecuting Brown while not prosecuting other inmates whose conduct Judge Ott found to be "substantially similar."

While this court accepts the credibility determinations of the Magistrate Judge, the undersigned will review *de novo* the Magistrate Judge's challenged conclusion that "Warden Rathman's assessment — that the failure to prosecute the other inmates was

---

[17] "[T]o adequately determine the credibility of a witness ... the fact finder must observe the witness." This requirement is satisfied "either by the district judge accepting the determination of the magistrate after reading the record, or by rejecting the magistrate's decision and coming to an independent decision after hearing the testimony and viewing the witnesses." *U.S. v. Powell,* 628 F.3d 1254, 1257 (11th Cir.2010)(internal citations omitted).

a matter of human error — is the most likely explanation for the distinction." (Doc. 46, p. 14). Initially, the court declines to accept Warden Rathman's assessment. It is clear from the transcript that Warden Rathman's "assessment" is simply his opinion, and that opinion is not even based on personal knowledge. Rather, the unrefuted evidence is that the decision to prosecute or not to prosecute any specific inmate was <u>not</u> made by Warden Rathman — it was made by the United States Attorney's Office.[18] Indeed, Warden Rathman clearly thought that Jeremy Pinson, another inmate who assaulted a guard, <u>should</u> be prosecuted for that assault. However, <u>AUSA Simpson</u> declined to prosecute.[19]

The Government had no obligation to explain Brown's disparate treatment unless Brown also showed improper motive. The court agrees that Brown's direct evidence

---

[18] *See* Defendant's Exhibit No. 1:

AUSA Simpson was also made aware that Inmate Pinson had physically assaulted one of the federal employees who had responded to the incident. The federal employee suffered a bruise to his arm as a result of the assault. AUSA Simpson indicated his office would prosecute Pinson if there was evidence that a weapon was involved in the assault on the federal employee.

On July 14, 2010, SIA Cynthia Thompson advised the video evidence did not reflect that Pinson was in possession of a weapon at the time fo the assault on the federal employee. AUSA Simpson was re-contacted and declined prosecution of Pinson.

[19] *See* Defendant's Ex. No. 3 ("On June 25, 2010, [Pinson] assaulted a fellow inmate with a sharpened metal weapon which cause the inmate to sustain serious injuries. Inmate Pinson refused all staff orders to stop the assault and he stabbed a staff member with the weapon when they attempted to pull the assaulted inmate to safety."). *See also*, Transcript, p. 78, l. 3 - l. 16.).

of improper motive fails. However, improper motive is not limited to direct evidence; it may be established by circumstantial evidence.[20] The court cannot tell if Judge Ott considered such circumstantial evidence or whether, since Brown asserted that he had direct evidence, he only considered — and discounted — the direct evidence.

The court therefore has considered the circumstantial evidence of motive and finds that Brown has failed to produce circumstantial evidence to meet his evidentiary burden of improper motivation. The court acknowledges that Brown has shown that, of the four inmates[21] who have thrown feces and/or urine on the face of a corrections officer, only Brown has been prosecuted for the conduct. However, this showing is insufficient to establish that Brown's constitutionally-protected conduct (of filing a civil suit in relation to the assault upon him by a guard) played any part in the decision to indict him for his alleged assault of a guard. And, absent such an invidious purpose, "the mere exercise of some selectivity by the government in instituting prosecutions is not itself a constitutional violation." *United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983) (citing *United States v. Rice*, 659 F.2d 524, 527 (5th Cir.1981)); *see also Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962).

_____

[20] Improper motive can be shown by direct or circumstantial evidence. *U.S. v. Deberry*, 430 F.3d 1294 (10th Cir. 2005), *cert. denied*, 127 S. Ct. 113, 166 L. Ed. 2d 86 (2006).

[21] Brown, Stephen Burke, Antoine Bruce, and Demarcus Law.

In *Greene*, three leaders of the union that represented Government air traffic control specialists participated in a work strike and prosecuted under 18 U.S.C. § 1918(3) for that conduct. The three claimed that they were selectively prosecuted because they were leaders of the specialists' union. They established that, of 300 air traffic control specialists who failed to report for work in the Dallas-Fort Worth area, only six individuals, including the three defendants in *Greene*, were prosecuted. The Government also acknowledged "some selectivity" in enforcement. Thus, the court turned to the second prong, motive. In doing so, the court found that the Government had shown that the *Greene* defendants were leaders in the strike itself and that this leadership role was a permissible (that is, non-invidious) reason for such selectivity. *Greene*, 697 F.2d at 1234.

The court has found no Eleventh Circuit case in which a defendant has ultimately shown improper motive through circumstantial evidence. In fact, it appears that very few cases ever reach this second prong because only a limited number of defendants show disparate effect. The law of the Eleventh Circuit is clear, however. It is the defendant's burden to show <u>both</u> disparate effect <u>and</u> improper motive. Disparate effect alone is insufficient. *U. S. v. Jordan*, 635 F.3d at 1188 ("The discriminatory purpose prong requires that the 'decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse

consequences upon an identifiable group." (quoting *Wayte*, 470 U.S. at 598) (quotations and alteration omitted)).

Further, this court finds that Brown has failed to show that he is part of "an identifiable group." He relies upon the congruence of two factors — he was assaulted by a prison guard who was indicted and plead guilty to that conduct, and he has filed a civil suit related to that assault — as the improper motivator for his pending charge. However, Brown wholly fails to show that those two factors cause Brown to be a member of, or associated with, any "identifiable group."

For all these reasons, the court finds that Brown has failed to carry his burden to show selective prosecution.

## 2. Vindictive Prosecution

"As long as the prosecutor has probable cause to believe the accused has committed a crime, the courts have no authority to interfere with a prosecutor's decision to prosecute." *United States v. Barner*, 441 F. 3d 1310, 1315 (11th Cir. 2006). The prosecutor will violate due process, however, if he obtains new charges out of vindictiveness, *i.e.*, a "desire to punish a person for exercising his [statutory or constitutional] rights." *Id*.; *see also United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ("[W]hile an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected

statutory or constitutional right.").

There are two ways to prove a prosecutorial vindictiveness claim: (1) by showing that a presumption of vindictiveness arises from the government's conduct; or (2) by showing actual vindictiveness. *See*, *e.g.*, *United States v. Saltzman*, 537 F.3d 353, 359 (5th Cir. 2008) (citing *Goodwin*, 457 U.S. at 384, n.19; *see also Barner*, 441 F. 3d at 1312, 1322 (holding that district court erred in determining that there was evidence to establish a presumption of vindictiveness, but remanding for determination of actual vindictiveness).

Brown's claim of vindictive prosecution is based on his allegation that he was prosecuted when others who are similarly situated were not because, before the charge he seeks to have dismissed was brought: (1) Brown was the victim of an assault by a BOP guard for which the guard had entered a guilty plea; (2) Brown had filed a civil suit in relation to that assault; (3) prison personnel were aware of those facts; and (4) Brown wrote an "inordinate number" of grievances against prison staff. (Doc. 48 at 2). However, even assuming that Brown has asserted a claim of presumptive or actual vindictiveness, he has failed to show the existence of either.

"A prosecutor's decision to seek heightened charges after a defendant successfully appeals his conviction for the same conduct is presumed to be vindictive." *Barner*, 441 F. 3d at 1315-16 (citing *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098,

40 L.Ed.2d 628 (1974)). There is, however, no automatic presumption of vindictiveness when a prosecutor decides to increase charges after a defendant exercises a legal right in the pretrial context. *Barner*, 441 F. 3d at 1316; *Goodwin*, 457 U.S. at 381 (declining to extend the automatic presumption of vindictiveness to a pretrial increase in charges). Although the Eleventh Circuit has not definitively determined whether the presumption of vindictiveness can ever arise in the pretrial — much less precharge — context, that court did note that such a presumption could arise in the pretrial context only if the facts of the case "form a realistic likelihood of vindictiveness." *Barner*, 441 F.3d at 1318 (citing *Goodwin*, 457 U.S. at 383-84). For such a presumption to arise, the defendant must first show that his exercise of pretrial rights was followed by charges of increased severity. *Id*. at 1318-19. If this threshold showing is made, the defendant then must identify other factors to raise a realistic likelihood of vindictiveness. *See id*. at 1320.

To establish actual vindictiveness, a defendant must prove that: (1) the prosecutor wanted to punish the defendant for exercising his rights (animus); and (2) the prosecutor's animus caused the prosecutor to bring charges of increased severity (causation). *See Barner*, 441 F. 3d at 1322 (citing *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001)). A showing of actual vindictiveness is "exceedingly difficult to make." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987) *reh'g en*

*banc granted*, *opinion vacated* 816 F.2d 695 (1987), *and opinion reinstated on reconsideration sub nom. Bartlett ex rel. Neuman v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987). Moreover, it would be unduly burdensome on any person challenging a prosecution as vindictive to limit the motive which must be shown to the subjective motive of the actual prosecutor, or even to the United States Attorney's office. *Simms v. United States*, __ A.3d __, 2012 WL 1215622, No. 11-cm-585, at * 9 (D.C. Court of Appeals, Apr. 12, 2012) (To impose a " 'personal stake' requirement unduly constricts the inquiry of prosecutorial vindictiveness, which is not limited to the motives of an individual prosecutor and may focus on the motivations of the government as an institution.").

Not surprisingly, Brown has not established actual vindictiveness. Crucially, however, Brown has not alleged a set of circumstances showing that "a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 373. All Brown has done is shown that he was assaulted by a guard, the guard was prosecuted and plead guilty, Brown filed a civil suit related to the assault, and Brown was indicted for assaulting a guard by throwing feces and urine in the guard's face although other inmates who had engaged in similar assaults were not indicted. Thus, the Government was not required to come up with a reasonable explanation for the difference in Brown's treatment. *See Simms*, 2012 WL 1215622, at * 7 (Government's obligation to answer or explain

allegations of prosecutorial vindictiveness does not arise unless "the accumulation of circumstances of record ..., without more, ... give rise to a realistic likelihood of prosecutorial vindictiveness.").

## IV.    Conclusions

For the reasons stated above, although Brown has been charged with similar conduct that other inmates have not been charged with, he has failed to show that the charges were selectively or vindictively brought by the Government against him because of or in retaliation for any constitutionally-protected act by him, as he has alleged, or that the United States Attorney's office holds any presumptive or actual animus against him.  Therefore, the R&R is **ADOPTED** as clarified herein.  Brown's Motions To Dismiss the indictment are due to be, and hereby are, **DENIED**.

**DONE** and **ORDERED** this the 29th day of May, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge